

U.S. Department of Justice

*Telephone 608/264-5158*
*TTY 608/264-5006*
*Main Facsimile 608/264-5172*
*Criminal Division Facsimile 608/264-5054*
*Civil Division Facsimile 608/264-5724*
*Administrative Facsimile 608/264-5183*

**United States Attorney**
**Western District of Wisconsin**

*Address:*
Suite 303, City Station
660 West Washington Avenue
Madison, Wisconsin 53703

*Mailing Address:*
United States Attorney's Office
P.O. Box 1585
Madison, Wisconsin 53701-1585

August 6, 2009

Mr. Daniel P. McAlvanah
Axley Brynelson, LLP
2 East Mifflin Street, Suite 200
Madison, WI 53703

Re:  *United States v. Friesses Minnow Farm, Inc.*

Dear Mr. McAlvanah:

This is the proposed plea agreement between the defendant and the United States in this case.

1. The defendant, Friesses Minnow Farm, Inc., agrees to waive indictment and plead guilty to Count One of the information filed by the United States Attorney's Office. This count charges a violation of 16 U.S.C. § 3372(a)(2)(A) which carries maximum penalties of a maximum fine, pursuant to 18 U.S.C. § 3571, which shall be the greatest of $500,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense, a three-year period of supervised release [probation], and a $400 special assessment. The defendant agrees to pay the special assessment at or before sentencing. The parties are not aware of any restitution which will be owed in this case. The defendant understands that the Court will enter an order pursuant to 18 U.S.C. § 3013 requiring the immediate payment of the special assessment. In an appropriate case, the defendant could be held in contempt of court and receive an additional sentence for failing to pay the special assessment as ordered by the Court.

2. The defendant acknowledges, by pleading guilty, that it is giving up the following rights: (a) to plead not guilty and to persist in that plea; (b) to a jury trial; (c) to be represented by counsel--and if necessary have the Court appoint counsel--at trial and at every other stage of the trial proceedings; (d) to confront and cross-examine adverse witnesses; (e) to testify and present evidence; and (f) to compel the attendance of witnesses.

August 6, 2009
Page 2

      3.     The defendant, through its officers, directors and employees, agrees to make a full, complete and truthful statement regarding the defendant's involvement in criminal conduct, as well as the involvement of all other individuals and entities known to the defendant its officers, directors and employees. These officers, directors and employees agree to testify fully and truthfully at any trials or hearings. The defendant understands that this plea agreement is not conditioned upon the outcome of any trial. This agreement is, however, contingent upon complete and truthful testimony in response to questions asked by the Court, the prosecutor or lawyers for any party.

      4.     The United States agrees to inform the Court of (1) any assistance provided by the defendant its officers, directors and employees, and (2) whether the defendant, through its officers, directors and employees, clearly demonstrates acceptance of responsibility for this offense, when imposing the sentence in this case. The defendant acknowledges that even if the United States informs the Court of the assistance, the Court is not required to reduce the defendant's sentence.

      5.     The United States further agrees that the statements of the defendant's officers, directors and employees made pursuant to this plea agreement will not be directly used against the defendant in determining the sentence. However, direct use of financial disclosures made by the defendant pursuant to this plea agreement is permitted. Moreover, indirect use of all statements is permitted. This indirect use includes pursuing leads based upon information provided by the defendant, as well as the use of the statements themselves for impeachment and rebuttal purposes, should the defendant, at any point, be allowed to withdraw its guilty plea. These indirect uses are permitted if any officer, director or employee of the defendant testifies inconsistently with the substance of these statements or the defendant otherwise presents a position inconsistent with these statements.

      6.     The United States agrees that this guilty plea will completely resolve all possible federal criminal violations that have occurred in the Western District of Wisconsin provided that both of the following conditions are met: (a) the criminal conduct relates to the conduct described in the information; and (b) the criminal conduct was known to the United States as of the date of this plea agreement. This agreement not to prosecute is limited to those types of cases for which the United States Attorney's Office for the Western District of Wisconsin has exclusive decision-making authority. The defendant also understands that the United States will make its full file available to the Probation Office for its use in preparing the presentence report. The United States agrees that this guilty plea will resolve all federal criminal violations committed by defendant, and its shareholders, officers, and employees, provided that the defendant remains in existence and complies with the terms of condition of any

August 6, 2009
Page 3

sentence imposed by the Court.

      7.    The defendant agrees to complete the enclosed financial statement and return it to this office within one week of the guilty plea hearing. The defendant also agrees that the probation office may disclose to the United States the net worth and cash flow statements to be completed by the defendant in connection with the preparation of the presentence report, together with all supporting documents.

      8.    The parties agree that the applicable fine is to be determined by the court pursuant to 18 U.S.C. §§ 3571 and 3572. The parties further agree to jointly recommend that any fine imposed be paid to the Lacey Act Reward Account pursuant to 16 U.S.C. § 3375(d). The parties acknowledge that the defendant disputes, and does not agree, that the market value set forth in the information is equivalent to "gross gain" for sentencing purposes.

      9.    The parties also agree to jointly recommend that, in addition to any other sentence imposed by the Court, that the Court impose the following conditions of probation, in addition to any other conditions imposed by the Court:

          A.    The defendant's facilities will be subject to not more than two (2) random facility inspections per calendar year, during the probation period. The inspection will be conducted by United States Fish and Wildlife Service (USFWS) Fish Health personnel and may be monitored by Wisconsin Department of Agriculture, Trade and Consumer Protection (DATCP) and/or Wisconsin Department of Natural Resources (WDNR) personnel in a procedure specified by the USFW, and as generally described in the attached survey of select pathogens from baitfish, incorporated herein by this reference. Copies of the completed inspection reports will be provided to DATCP, WDNR, and the Defendant. All inspections and tests will be paid for by the defendant.

          B.    The defendant will be subject to the random testing of imported baitfish, at the discretion of the USFWS, not to exceed 3 lot inspections per month during the first two (2) years of the probationary term, with the defendant paying for all tests, and as generally described in the attached survey of select pathogens from baitfish, incorporated herein by this reference. The defendant will be required to submit to the USFWS and the WDNR a list of anticipated imports, including the species of baitfish and company that the baitfish are to be purchased from, by the 25th day of the month preceding the month of the proposed importation. In addition, the defendant must submit monthly reports to the USFWS and the WDNR on their imports/exports and any other interstate transportation of baitfish to include species, quantity, price, and recipient by the 10th of each month following the month of the interstate

August 6, 2009
Page 4

transportation.

   C. The defendant agrees that DACTCP or WDNR personnel may stop defendant's vehicles at any time, inspect cargo, and examine documentation which defendant is required to possess for the possession, importation, transportation, purchase or sale of baitfish.

  10. In the event of an appeal by either party, the United States reserves the right to make arguments in support of or in opposition to the sentence imposed by the Court.

  11. The defendant understands that sentencing discussions are not part of the plea agreement. The defendant should not rely upon the possibility of a particular sentence based upon any sentencing discussions between defense counsel and the United States.

  12. If your understanding of our agreement conforms with mine as set out above, would you and the defendant please sign this letter and return it to me. By its signature below, the defendant acknowledges its understanding that the United States has made no promises or guarantees regarding the sentence which will be imposed. The defendant also acknowledges its understanding that the Court is not required to accept any recommendations which may be made by the United States and that the Court can impose any sentence up to and including the maximum penalties set out above.

  13. All plea agreements must be approved by the United States Attorney or his designee. This plea proposal has not yet been approved. Consequently, I have not signed this proposed plea agreement and the final acceptance is conditioned upon supervisory approval. If you have any questions or need any additional information, please feel free to contact me.

               Very truly yours,

               STEPHEN P. SINNOTT
               Acting United States Attorney

10/20/19
Date

               PETER M. JAROSZ
               Assistant United States Attorney

August 6, 2009
Page 5

_____ *[signature]*     \_\_10-20-09\_\_
DANIEL P. MCALVANAH                                    Date
Attorney for the Defendant

_____ *[signature]*     \_\_10-20-09\_\_
CRAIG FRIESS                                            Date
President, Friesses Minnow Farm, Inc.

**Survey of select pathogens from baitfish**

**Statement of Work**

The U.S. Fish & Wildlife Service's La Crosse Fish Health Center (LFHC) will provide sampling and testing of 60 baitfish per lot. For virology, kidney and spleen samples will be combined into 5-baitfish pooled samples for a total of 12 samples; 30 individual baitfish will be tested for bacteriology and 20 baitfish will be externally and internally examined for parasites. Testing will focus on detecting the presence or absence of a targeted list of pathogens of concern (listed below).

LFHC will screen and confirm pathogens using procedures listed in the Laboratory Procedures Manual for the National Wild Fish Health Survey (3.1 ed., March 2006, available online at http://www.fws.gov/wildfishsurvey) and/or the AFS-FHS (American Fisheries Society-Fish Health Section), FHS blue book: suggested procedures for the detection and identification of certain finfish and shellfish pathogens (2007 edition or most recent. AFS-FHS, Bethesda, Maryland). LFHC will also perform confirmatory or other specialized tests needed to substantiate or refute laboratory results, such as Polymerase Chain Reaction (PCR) assays. Fish health laboratory results reports will be provided upon completion of testing for each facility.

**Pathogens of concern in baitfish**

**Viruses**
IPN (Infectious Pancreatic Necrosis Virus)
IHN (Infectious Hematopoetic Necrosis Virus)
VHS (Viral Hemorrhagic Septicemia Virus)
OMV (Oncorhynchus masou Virus)
LMBV (Largemouth Bass Virus)
SVCV (Spring Viremia of Carp Virus)
Fathead Minnow Virus
Grass Carp Reovirus (syn. Golden Shiner Virus)
Unknown viruses (or replicating agents)

**Bacteria**
*Aeromonas salmonicida*
*Yersinia ruckeri*
*Renibacterium salmoninarum*
*Edwardsiella ictaluri*

**Parasites**
*Glugea* sp.
*Heterosporis* sp.
*Pleistophora ovariae*
*Myxobolus* sp.
*Dactylogyrus* sp.
*Gyrodactylus hoffmani*
*Bolbophorus confusus*
*Diplostomum spathaceum*
*Bothriocephalus acheilognathi*- Asian Tapeworm
*Ligula intestinalis*
*Ergasilus* sp.
*Lernaea* sp.

**Facility inspections:**

The company would be subject to up to 2 facility inspections per year. The facility inspections include the examination and testing of baitfish held at the time of the inspection by the company either in ponds or other artificial storage locations not including vehicles that are about to deliver baitfish to customers. For the purposes of this health assessment work a lot will be defined as baitfish of the same species that share a common water source. If the company uses vehicles to store baitfish as a part of their business, then the baitfish in those vehicles at the facility at the time of the inspection may be subject to testing as part of the facility inspection. The businesses will not be required to be closed during the inspections.

The cost of the inspections would be $1,500 per lot of baitfish. For each inspection there is also a $300 travel expense added to the total cost of the baitfish lots examined. A lot of baitfish is defined as 60 baitfish of each species, and if the baitfish are from different locations then they would be considered different lots. For example, if one pond at the facility had fathead minnows from Minnesota and another pond had fathead minnows from Arkansas then they would be considered to be two separate lots of baitfish and each would be tested. In another scenario two ponds could contain fathead minnows that were obtained from the same source. In this case 30 baitfish would be sampled from each pond and the total 60 baitfish sample would be considered one lot. The total cost of the inspection will depend upon how many species of baitfish are present at the time of inspection and how many different sources the baitfish came from, but in no event will the total cost of the facility inspection exceed $5,000 during a calendar year.

The inspections will be during normal business hours Monday through Friday between the hours of 8 AM and 5 PM. The inspections will be random and unannounced. If the facility is closed or otherwise unstaffed at the time of the inspection, the inspectors will return at another random unannounced time. The baitfish will be examined for the pathogens of concern listed in the survey document. If any other viruses, bacteria, or parasites are found they will also be reported to DATCP and the WDNR.

**Monthly inspections:**

The monthly inspections will consist of no more than three lot inspections per month. A lot is defined as a 60 baitfish sample of an individual species being imported from a specific company during the month. For example, if the company is importing fathead minnows and sucker minnows from a Minnesota company, we may require that a 60 baitfish sample of fathead minnows be submitted for examination from the shipment. This would be one lot of baitfish at a cost of $1,500 per lot of baitfish plus the cost of shipment to the USFWS Baitfish Health Center in Onalaska, WI. Both parties agree to work in good faith to insure the best sampling and shipment method is used under specific directions and procedure of USFW.

Up to three lots are subject to examination in any given month for a maximum of 36 lots tested per year. There is no requirement for every lot of baitfish tested for DATCP

VHA requirements to be submitted for probationary compliance testing. The suggestion of having the veterinarian who is doing the DATCP VHA testing to also take a 60 baitfish sample for compliance testing was offered as advise to simplify the collection if a particular lot of baitfish is requested for compliance testing.

Companies will be required to notify the USFWS and the WDNR of all imports by the 25th day of the preceding month of the imports. In addition, the defendant must submit monthly reports to the USFWS and the WDNR on their imports/exports and any other interstate transportation of baitfish to include species, quantity, price, and recipient by the 10th of each month following the month of the interstate transportation.

In the event a lot selected for testing by USFWS or WDNR under this plea agreement is also the same lot in which a sample must be taken by a veterinarian or other authorized person to comply with the Veterinary Health Authorization (VHA) required by DATCP for the issuance of an import permit, the veterinarian or other authorized person will take an additional 60 baitfish sample of each species and forward this sample, on ice, via overnight mail to the USFWS Fish Health Center in Onalaska, WI, for laboratory testing. Once a completed VHA for the shipment is received by DATCP, DATCP may issue an import permit according to established policy. DATCP is in not required to wait for the results of the USFWS testing to issue an import permit.

Copies of the completed test results will be provided to company, DATCP and the WDNR.

## CORPORATE RESOLUTION

The undersigned, being the shareholder, president, and director of Friesses Minnow Farm, Inc., hereby approves the following Resolution:

**BE IT RESOLVED THAT**:

Craig Friess, the President of Friesses Minnow Farm, Inc., is authorized and directed to sign and deliver to the United States Attorney's Office for the Western District of Wisconsin the plea agreement dated August 6, 2009 in the matter of United States v. Friesses Minnow Farm, Inc.

Dated this 13th day of August, 2009.

FRIESSES MINNOW FARM, INC.

By: _____
Craig Friess
President and Shareholder